**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**JENNIFER BYRD,**

      **Plaintiff,**

**v.**                                  **Case No. 8:14-CV-1736-T-35-EAJ**

**THOMAS KNIGHT, in his official**
**capacity as SARASOTA COUNTY**
**SHERIFF,**

      **Defendant.**
_____/

**<u>ORDER</u>**

**THIS CAUSE** comes before the Court for consideration of a Motion for Summary Judgment filed by Defendant Thomas Knight, in his official capacity as Sarasota County Sheriff ("the Sheriff") (Dkt. 22), Plaintiff Jennifer Byrd's Response in Opposition thereto (Dkt. 34), and the Sheriff's Reply (Dkt. 42).  The parties filed a Joint Stipulation of Agreed Material Facts.  (Dkt. 31)  Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court orders that the Sheriff's motion is **GRANTED in part and DENIED in part**.

**I.**      **BACKGROUND**

The following are facts accepted by the parties as true for purposes of resolving this motion for summary judgment:

Jennifer Byrd worked as a Deputy Sheriff for the Sarasota County Sheriff's Office (SCSO) from January 2005 until she was fired on September 18, 2013.  (Dkt. 31, ¶ 1)  While on duty on December 17, 2011, Byrd stopped a vehicle driven by Bernadette

Kenniff, the daughter of two SCSO employees: Charles Kenniff, a lieutenant, and Sarah Kenniff.  (Id. at ¶ 4)  In connection with that stop, Byrd instituted charges against Bernadette for battery on a law enforcement officer.  (Id. at ¶ 8)  Byrd also filed a workers' compensation claim for the injuries that she suffered.  (Id. at ¶ 9)  Byrd filed a second workers' compensation claim one year later.  (Dkt. 27, "Byrd Dep." p. 213)

Following a series of events, most of the details of which remain in dispute, Plaintiff was terminated on September 18, 2013.

As a result, Byrd filed this lawsuit.  Byrd alleges that she was retaliated against for refusing to drop the charges against Bernadette, in violation of Florida's public-sector Whistle-blowers Act, Fla. Stat. §§ 112.3187, et seq.  Byrd also alleges that she was retaliated against for pursuing her workers' compensation claims, in violation of Fla. Stat. § 440.205.  Finally, Byrd alleges that she was discriminated and retaliated against in response to her claims of disability and requests for accommodation, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 102, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10.  (Dkt. 12)

## 1. Alleged retaliation for Byrd's refusal to drop the battery charge

On February 7, 2012, the SCSO's general counsel, Patrick Duggan, sent an email to Byrd telling her to call Bernadette's defense attorney.  (Byrd Dep., pp. 158-59, 184; Dkt. 28-1, p. 1)  Bernadette's defense counsel was Frederick Mercurio, the brother of Lieutenant Michael Mercurio, who was the head of the SCSO's Internal Affairs.  (Dkt. 35, "Byrd Aff." ¶ 8)  According to Byrd, Frederick Mercurio "basically wanted me to drop the charges.  And when I refused, he became angry about it to the point I ended the conversation and told him I would no longer speak to him about the situation."  (Byrd Dep.,

p. 159)  Byrd felt that Mercurio's hostility was "coming from SCSO because of the manner in which and by whom I was instructed to call him, as well as the relationship between Lt. and Bernadette Kenniff, and Bernadette Kenniff's attorney and the SCSO Head of Internal Affairs."  (Byrd Aff. ¶ 8)  Byrd also felt that Duggan's email message was intimidating, threatening, and coercive because she had never before received a request from the general counsel's office to call a defense attorney.  (Id.)

Byrd avers that her supervisor, Sergeant Brian Woodring, told her that SCSO command staff and/or other SCSO members suggested to him that Byrd should change her story and that her failure to do so could cause her a "rough road."  (Byrd Aff. ¶ 3) Although Woodring testified that while he did not recall this conversation, he did recall that Lieutenant Kenniff expressed anger or displeasure over Byrd's refusal to drop the charge.  (Dkt. 36, "Woodring Dep." pp. 11-14)  Woodring also testified that other deputies approached him and referenced the incident, but Woodring could not recall their names. (Woodring Dep., p. 13)

In April 2012, Lieutenant Kenniff initiated an Internal Affairs ("IA") investigation regarding two citations that Byrd issued to Bernadette on December 17, 2011.  (Byrd Aff. ¶ 5)  Although Byrd acknowledged that she "made a mistake" in issuing the two citations, she maintains that the IA investigation was retaliatory because Lieutenant Kenniff originally paid the citations and did not contest them until after Byrd refused to drop the charge against Bernadette.  (Id.; Byrd Dep., p. 97)  Byrd was given a 10-hour suspension for issuing the two improper citations.  (Byrd Dep., p. 108)  Byrd was also given a letter of reprimand for not entering a DVD into property right away.  (Id.)  Byrd testified that her supervising captain, Captain Richard Mottola, told her that IA directed him to structure the

punishments so that she could not appeal.  (Id. at 108, 121)  Byrd also maintains that the IA investigation was originally assigned to Rick Reilly, who felt it was egregious and retaliatory, and that the investigation was then transferred to another officer.  (Id. at 137; Byrd Aff. ¶ 5)

In July 2012, Sarah Kenniff initiated a second IA investigation against Byrd, regarding a "mock arrest" that Byrd conducted with a television personality at a local book-signing event.  (Byrd Aff. ¶ 6)  Byrd posted photos of the arrest on her private Facebook page.  Byrd maintains that Sarah Kenniff enlisted the wife of another SCSO employee to obtain the photos.  (Id.)  On September 4, 2012, Byrd received a 20-hour suspension for violating the general order on practical jokes.  (Dkt. 24, "Duggan Aff." ¶ 7)

 Byrd maintains that the second IA investigation was retaliatory because other employees had done similar things.  (Byrd Dep., pp. 142-43)  According to Byrd, Captain Ron Locke, who prepared the final documents for the second IA investigation, "indicated that he thought Sarah Kenniff's motivation for initiating the IA investigation was suspect." (Byrd Aff. ¶ 6)  Byrd further avers that Captain Mottola told her that he thought the initiation and pursuit of both IA investigations was egregious, harassing, and retaliatory.  (Byrd Aff. ¶ 7; Byrd Dep., p. 146)  Captain Mottola testified that he had no reason to think that either Lieutenant Kenniff or Sarah Kenniff had suspect motivations in initiating the IA investigations.  (Dkt. 37 "Mottola Dep." p. 23)

In August 2012, after initiation of the second IA investigation but before the formal decision, Byrd met with the Sheriff and Colonel Steve Burns to express her concerns regarding the harassment and hostile work environment she was experiencing based on her refusal to drop the battery charge and her pursuit of a workers' compensation claim.

4

(Byrd Aff. ¶ 9; Byrd Dep., pp. 197-98)   According to Byrd, Colonel Burns told her to "[g]et over it and move on."   (Byrd Dep., p. 198)   The Sheriff responded that "not everybody gets along," and that she should be grateful that she did not get fired over the Facebook photos.  (Byrd Dep., pp. 198-99)

By letter dated April 3, 2013, an anonymous sender delivered documents to a defense attorney in an unrelated matter, explaining in the cover letter that they were to "help next week in your hearing involving Jennifer Byrd."  (Byrd Aff. ¶ 10; Dkt. 28-1, p. 8) The letter further stated: "As you can see, there are already two prior Internal Affairs involving Jennifer Byrd.  I hope you will file the third one."  (Dkt. 28-1, p. 8)  The letter was signed "A concerned citizen who is disgusted by bad deputies like Dominic Fornal and Jennifer Byrd."  (Id.)   Given the confidential content of the packet and the timing of delivery, Byrd believes that it was sent by an employee or agent of the SCSO.  (Byrd Aff. ¶ 10)

### 2. Workers' compensation claims and medical treatment

On the night of the incident with Bernadette, December 17, 2011, Byrd filed a workers' compensation claim. (Byrd Dep., p. 168)   The claim was the third workers' compensation claim that Byrd had filed since beginning to work for the Sheriff in 2005. Byrd filed the first claim for an incident in 2006 or 2007, involving a contusion on her arm, which did not cause her to miss work.  (Id. at 33)  Byrd filed a second claim after an accident during SCSO motorcycle training, which did cause her to miss work.  (Id. at 19, 29-31)

Between December 2011 and September 2012, Byrd received treatment for pain in her right forearm, and she missed days of work due to injections, physical therapy, and

other treatment.  (Id. at 168-70).  During in-service training at the gun range in September 2012, Byrd realized that she no longer possessed the same grip strength in her right hand. (Id. at 170-71)  On September 21 or 22, Byrd's workers' compensation physicians placed her on light-duty.  (Id. at 171)  At that point, Byrd had a 52-pound deficit between her strong and weak side, and she claimed she was "in horrible pain, could barely move [her] wrist and fingers everything was so swollen and inflamed in there.  So [she] had a lot of pain and discomfort associated with it as well as the loss of grip strength."  (Id.)

On December 6, 2012, Byrd began treating with Christopher Sforzo, M.D., a board-certified orthopedic surgeon, who diagnosed De Quervain's syndrome.  (Dkt. 30, "Sforzo Dep." pp. 5, 11-12, 29)  During an MRI of her right wrist, Byrd's right shoulder was injured. (Byrd Dep., pp. 11-12)  On December 20, 2012, Byrd filed a workers' compensation claim for that injury.  (Id. at 213)

On August 27, 2013, Dr. Sforzo determined that Byrd had reached maximum medical improvement ("MMI") for her De Quervain's syndrome and assigned a permanent impairment rating of three percent. (Sforzo Dep., pp. 19-23, 32)  Dr. Sfrorzo also assigned permanent work restrictions, limiting Byrd to 20 pounds of carrying, pushing, and pulling, and having no contact with fugitives or inmates.  (Id. at 22; Dkt. 30-3, pp. 19-20)  Dr. Sforzo requested a transfer of care to pain management for additional treatment for Chronic Regional Pain Syndrome (CRPS), with a possible stellate ganglion block, a targeted hand therapy program, and medication.  (Sforzo Dep., p. 25; Dkt. 30-2, p. 30) Dr. Sforzo also stated that pain management should provide an MMI status and permanent impairment rating for the CRPS diagnosis.  (Sforzo Dep., pp. 32-33; Dkt. 30-

2, p. 30)  On September 16, 2013, Dr. Sforzo discharged Byrd from his practice.  (Byrd Aff. ¶ 12; Dkt. 38).

While Byrd treated with Dr. Sforzo, she received treatment for CRPS through Douglas Constant, M.D., a pain management physician.   (Sforzo Dep., p. 30). Approximately one week before Byrd's August 27, 2013 visit with Dr. Sforzo, Dr. Constant retracted his CRPS diagnosis, opined that Byrd was at MMI, and referred Byrd back to Dr. Sforzo for an impairment rating.  (Sforzo Dep., pp. 24, 31)  On September 10, 2013, Dr. Constant discharged Byrd from his practice.  (Byrd Aff. ¶ 12; Dkt. 38)

Because Byrd did not receive any additional pain management treatment, Dr. Sforzo testified that Byrd was not at "overall" MMI for her right upper extremity as of August 27, 2013, although she was at MMI from an orthopedic standpoint.  (Sforzo Dep., pp. 32-33)    Ultimately, two other physicians – Lynn R. Fassy, M.D., an independent medical evaluator, and Peter Lopez, M.D., a treating orthopedist – agreed that Byrd was not at MMI for her right upper extremity.   (Dkt. 29, "Lopez Dep." p. 47; Dkt. 39)

### 3. Termination

On September 12, 2013, the SCSO's workers' compensation administrator, OptaComp, requested clarification from Dr. Sforzo as to whether his work restrictions were permanent and only for the De Quervain's syndrome.  (Dkt. 23 "Burns Aff." ¶ 7, Exh. C)  On September 16, 2013, the SCSO received Dr. Sforzo's clarified opinion that the restrictions were permanent and only for the De Quervain's syndrome.  (Id.; Dkt. 25, "Hoffman Aff." ¶ 2)    Pursuant to standard procedure, the SCSO's Health/Safety Compliance Manager, Debbie Burns, compared the work restrictions to Byrd's job duties and determined that Byrd could not perform the job of Deputy Sheriff.  (Burns Aff. ¶¶ 8-9)

Burns then reviewed available SCSO positions and found three positions that Byrd might be able to physically perform: Communications Operator II, Crime/Data Analyst, and Booking Technician.  (Id. at ¶¶ 10-11)

On September 17, 2013, Captain Paul Marshall and Major Kurt Hoffman informed Byrd that she was no longer able to be a Deputy Sheriff, based on the MMI provided by her two doctors.  (Byrd Dep., pp. 178-79)  As an alternative, they offered her three positions:  Communications Operator II, Booking Technician, and Corrections Data/Research Analyst.  (Id. at 179; Dkt. 28-1, p. 37)  Byrd inquired as to how she was supposed to physically perform the jobs, given that she could not use her right arm.  (Byrd Dep., pp. 179-80)  Byrd asked for a teaching position or an investigative aid position, but was told that those were not options, and she was advised that she had to select one of the three positions.  (Byrd Dep., p. 182; Byrd Aff. ¶ 18)  Byrd asked whether the salaries for the three positions could be adjusted to be more commensurate with her current salary and was told that could be addressed later, once she selected a position.  (Byrd Dep., pp. 182-83)

Although they asked for a response by 4:00p.m., Byrd emailed Captain Marshall and Major Hoffman to request until the close of business the following day, which they allowed.  (Byrd Dep, p. 181; Dkt. 25, p. 4)[1]  The following day, Byrd emailed Captain Marshall and Major Hoffman, stating that she "vehemently do[es] not agree with our meeting yesterday in regards to my employment status.  I believe if I were able to get the proper treatment I think I could still be a police officer and believe that remains to be

---

[1] Byrd testified that she asked for at least a day to "try to figure it out," which is consistent with the email she sent after the meeting.  (Byrd Dep, p. 181; Dkt. 25, p. 4)  It is also consistent with her affidavit, in which Byrd more generally avers that she "asked for time to explore my options." (Byrd Aff. ¶ 16)

seen." (Dkt. 28-1, p. 48)  Byrd stated that she had not been given assistance in getting treatment for depression, that she needed a targeted hand therapy program, and that she needed occupational therapy for CRPS.  Byrd also noted that she had been discharged from both Dr. Sforzo and Dr. Constant, leaving her with no doctor.  Byrd closed saying: "I am not rejecting your offers of alternate employment but feel it is premature at this juncture." (Id.)

The Sheriff terminated Byrd effective September 18, 2013.  (Byrd Dep., p. 5; Dkt. 28-1, pp. 37-38)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).  Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence viewed "in the light most favorable to the non-moving party." Fennell, 559 F.3d at 1216.  A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court "that there is an absence of evidence to support the non-moving party's case." Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (internal quotation marks omitted).

When a moving party has discharged its burden, the non-moving party must designate specific facts that demonstrate there is a genuine issue for trial. Porter v. Ray,

461 F.3d 1315, 1320 (11th Cir. 2006).   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

### A.   Disability Discrimination (ADA and FCRA)

Byrd brings claims for disability discrimination under the ADA and FCRA, which are analyzed using the same framework.  Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007); McCaw Cellular Commc'ns of Fla., Inc. v. Kwiatek, 763 So. 2d 1063, 1065 (Fla. 4th DCA 1999).  Byrd asserts claims for both unlawful termination and failure to accommodate.

In the absence of direct evidence of discrimination, Byrd's unlawful termination claim is analyzed under the familiar McDonnell Douglas burden-shifting scheme.  Id.  To establish a prima facie case of disparate treatment, an employee must demonstrate that, at the time of the adverse employment action: (1) she had a disability; (2) she was a "qualified individual;" and (3) the employer unlawfully discriminated against her because of the disability.  Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1267 (11th Cir. 2014).  The burden then shifts to the employer to articulate a non-discriminatory reason for the challenged employment action.  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004).  If the employer satisfies its burden, the employee may demonstrate that the employer's stated reasons are a pretext for unlawful discrimination.

Id.   "[T]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).

In failure-to-accommodate claims, the third prong of the prima facie case requires the plaintiff to show that she was discriminated against by virtue of the defendant's failure to provide a reasonable accommodation.  Holly, 492 F.3d at 1262 & 1263 n.17; McKane v. UBS Fin. Servs., Inc., 363 F. App'x 679, 681 (11th Cir. 2010).  A plaintiff alleging failure-to-accommodate does not have the burden to show disparate treatment because "an employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."  Holly, 492 F.3d at 1262.  As a result, the burden-shifting scheme does not apply to failure-to-accommodate claims.  Id.

In the instant motion, the Sheriff argues that Byrd is not a "qualified individual," under the second prong of the prima facie case.  The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). "'Essential functions include fundamental job duties, but do not include marginal functions of the position.'"  Samson v. Fed. Exp. Corp., 746 F.3d 1196, 1200 (11th Cir. 2014); 29 C.F.R. § 1630.2(n)(1).  "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors."  Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir.2000).  The employer's judgment as to which functions are essential is entitled to substantial weight but is not conclusive. Samson, 746 F.3d at 1201; 42 U.S.C. § 12111(8).  Other factors include:

any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs.

Id. (citing 29 C.F.R. § 1630.2(n)(3)(ii)-(vii)).

The Sheriff maintains that Byrd could not perform the essential functions of the Deputy Sheriff position at the time of her termination because of Dr. Sforzo's restrictions. (Dkt. 22, p. Hoffman Dep., p. 52, 56; Byrd Dep., pp. 178-79)  In response, Byrd "does not dispute she was unable to perform the essential job functions of Deputy Sheriff at the time of her termination."  (Dkt. 34, p. 8)  She instead suggests that the Sheriff's termination of her as Deputy Sheriff was premature and that he should have waited to reassess her MMI upon further consultation with her medical providers.

Byrd's argument is not sufficient to survive summary judgment.  As noted above, she concedes that she was not qualified to perform the essential functions of the Deputy Sheriff position at the time of her termination.  Contrary to her argument, she was not entitled to an indefinite amount of time in which to prove she could become qualified to return to her position.  It is well-settled that an employer does not violate the ADA by "refusing to grant [an employee] a period of time in which to cure his disabilities where the employee sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions." Wood v. Green, 323 F.3d 1309, 1313 (11th Cir. 2003) (quoting Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir. 1997) (per curiam)).  The SCSO also was not required to find an alternate job for her once she became disabled and unqualified to perform the Deputy Sheriff position.  See, e.g., McCollough v. Atlanta Beverage Co., 929 F. Supp. 1489, 1502 (N.D. Ga. 1996)

(rejecting plaintiff's argument that once he became unqualified to perform his job duties, his employer was required to find him another job somewhere in the company).

Alternatively, Byrd maintains that an individual may be a qualified individual with respect to a position that she "holds or desires." 42 U.S.C. § 12111(8) (emphasis added). She thus argues that "she could have, with an accommodation, performed the essential functions of a position within the SCSO, perhaps one of the 3 that were offered to her." (Dkt. 34, p. 8)  However, the term "desires" as used in the statute is inapplicable to Byrd. As the Ninth Circuit Court of Appeals explained in Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1112 (9th Cir. 2000), the word "holds" refers exclusively to current employees and the term "desires" refers exclusively to job applicants.  Therefore, as an individual already employed by the SCSO, Byrd was required to be a qualified individual with respect to the position she held at the time, not with respect to any other jobs within the SCSO she may have desired or believed she could perform.

Because Byrd has failed to demonstrate that she is a "qualified individual," as required to establish her prima facie case of disability discrimination, the Sheriff's motion for summary judgment is GRANTED as to Counts III and V.[2]

## B.    Retaliation (ADA and FCRA)

Byrd also claims that the Sheriff terminated her in retaliation for requesting accommodations for her disability.  The ADA prohibits retaliation against an individual

---

[2] Had Byrd demonstrated that she was a qualified individual, her disparate-treatment claim would fail because there is no evidence of pretext, as discussed in the next section.  The failure-to-accommodate claim would fail because, as the Sheriff argues in his reply, there is no evidence that Byrd ever requested the accommodations that she now urges were appropriate.  (Dkt. 42, pp. 7-8); see Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) ("the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made").

who "has opposed any act or practice made unlawful by this chapter or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."   42 U.S.C. § 12203(a).   The McDonnell Douglas burden-shifting scheme applies to ADA retaliation claims.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).   To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and the protected expression.  Lucas, 257 F.3d at 1260.

The Sheriff does not dispute that Byrd can establish a prima facie case of retaliation.[3]  Instead, the Sheriff presents a non-retaliatory reason for Byrd's termination: she could not perform the job of Deputy Sheriff, and she failed to accept reassignment to another position.  (Dkt. 22, p. 24)

Having articulated a non-retaliatory reason for Byrd's termination, the burden shifts to Byrd to demonstrate that the Sheriff's reason is pretextual.  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989) (internal quotation marks omitted); Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1346 (11th Cir. 2000).   For instance, a plaintiff may demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

---

[3] Although Byrd is not a qualified individual, this is not necessarily fatal to her retaliation claim, which requires only a reasonable belief that she was protected under the ADA.  Branscomb, 461 F. App'x at 906.

14

proffered legitimate reasons." <u>Jackson v. State of Ala. State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted).  However, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions," and a plaintiff may not establish pretext merely by quarreling with the wisdom of an employer's decision.  <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotation marks and alteration omitted).

As evidence of pretext, Byrd argues that the deadlines imposed by the Sheriff in regard to the reassignment offers were premature and that she was not given opportunities other deputies were afforded to confer with her doctors.  (Dkt. 34, p. 19)

As to time given to other deputies, Byrd offers the following deposition testimony from Colonel (formerly, Major) Hoffman:

> Q: In the past you've given officers or members opportunity to discuss reassignment offers with their authorized physicians prior to terminating them, have you not?
>
> A. I believe we have.

(Hoffman Dep., p. 69)  Byrd also cites Colonel Hoffman's deposition testimony in another case (Case No. 8:12-cv-635), relating that he gave an employee ten days to confer with his doctors:

> I just thought that was a—for lack of a better phrase, a benevolent thing to allow him an opportunity to try to seek clarification from his doctor.  He was already on administrative leave, so I knew he wasn't taking any law enforcement action.  We had gun, badge and car at that point, so to allow him that opportunity, I didn't see that as, with the short time frame, detrimental to the agency.

(Dkt. 34-3, pp. 57, 96)[4]

---

[4] The Sheriff does not object to this evidence on evidentiary grounds, and the Court may take judicial notice of prior depositions.  <u>Kinnett Dairies, Inc. v. Farrow</u>, 580 F.2d 1260,

Of course, "evidence of comparators who are treated more favorably cannot show pretext unless those comparators are 'similarly situated to the plaintiff in all relevant respects.'" Holmes v. Ala. Bd. of Pardons & Paroles, 591 F. App'x 737, 744 (11th Cir. 2014) (quoting Rioux v. City of Atlanta, 520 F.3d 1269, 1280 (11th Cir. 2008)).   Here, because the Sheriff conceded, for purposes of the motion that Byrd could make out a prima facie case, he did not address the matter of the sufficiency of evidence as to comparators or whether their more favorable treatment in responding to deadlines to accept offered alternative placement bore on Plaintiff's claim of pretext. Likewise in the reply, the Defendant did not address the claimed comparators and the allegedly disparate and retaliatory treatment of Plaintiff as generally addressed in the deposition of Colonel (formerly, Major) Hoffman.   Accordingly, the Court finds this unrebutted evidence could be considered indicative of pretext.

Byrd's argument that the Sheriff did not engage in the ADA's "interactive process" is unpersuasive and will not be allowed to be presented at trial.  The failure to engage in an interactive process, while relevant to a failure-to-accommodate claim, is not probative of a retaliatory animus.  Stewart, 117 F.3d at 1288 (holding that acts such as denying the plaintiff extended breaks "relate directly to her 'reasonable accommodation' discrimination claim, not her retaliation claim, and accordingly provide no basis for denying summary judgment on this issue.").  "[D]iscrimination on the basis of disability is different from retaliation on the basis of opposing unlawful practices or filing a charge against the employer." Calvo v. Walgreens Corp., 340 F. App'x 618, 625 (11th Cir. 2009).

---

1277 n.33 (5th Cir. 1978) (explaining that it is not error for a court to take judicial notice of related proceedings and records in cases before that court).

For the foregoing reasons, the Court finds that Byrd could no longer perform her job of Deputy Sheriff, but that it is possible that she could prove at trial that she could have performed one of the three alternative positions the Sheriff offered to her if she had been given a fair opportunity to consider them. Oddly, even though the Sheriff was not required to find other positions suitable to the Plaintiff as an accommodation to her in response to her ADA claim, once the positions were offered, the Sheriff could not arbitrarily withdraw them in retaliation for Plaintiff's exercise of her protected rights. Rather, she should have been provided the same opportunity as everyone else displaced from a position to consider other offered positions. Evidence exists that the denial of that fair opportunity could have been in retaliation for her engaging in protected activity in the exercise of her rights under the ADA. The Sheriff's motion for summary judgment is therefore GRANTED in part and DENIED in part as to Counts IV and VI.

**C.     FWA**

Florida's public-sector Whistle-blower's Act ("FWA"), Fla. Stat. §§ 112.3187, et seq., provides a cause of action for employees subject to retaliation for making certain disclosures protected under the Act. Metro. Dade County v. Milton, 707 So. 2d 913, 916 (Fla. 3d DCA 1998).  FWA claims are evaluated under the McDonnell Douglas burden-shifting analysis. Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000). To establish a prima facie case, Byrd must demonstrate that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two events.  Fla. Dep't of Children and Families v. Shapiro, 68 So. 3d 298, 305-06 (Fla. 4th DCA 2011).

The Sheriff argues that Byrd did not engage in the requisite protected activity.  In order to invoke the protections of the FWA, an employee must disclose information that includes:

(a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

(b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

Fla. Stat. § 112.3187(5) (emphasis added).  Byrd claims that she disclosed violations or suspected violations of law committed by Bernadette.  (Dkt. 12, ¶ 39)  The Sheriff argues that Byrd's report to her superiors regarding Bernadette did not concern violations or mismanagement committed by "an employee or agent . . . or independent contractor." Fla. Stat. § 112.3187(5).  In her response, Byrd does not dispute that point.

Byrd next maintains that she also alleged that her "refusals to drop the charges against Bernadette Kenniff . . . constituted objections to an activity, policy, or practice that is in violation of law, rule or regulation applicable to the employer. . . which objections are protected activity [under the FWA]."  (Dkt. 12, ¶ 40)   However, Byrd's refusal to drop the battery charge does not constitute a disclosure of a violation of law, mismanagement, or other enumerated conduct by an employee, agent, or independent contractor.

As a final argument, Byrd asserts that her reports to the Sheriff, Sergeant Woodring, and Captain Mottola about the retaliation she was experiencing constitute protected activity, and that she will file a motion to amend to assert such claims, if necessary.  (Dkt. 34, pp. 6-7)  As explained below, any such amendment would be futile.

The FWA protects employees who report violations under the reporting channels identified in the statute.  Shaw v. Town of Lake Clarke Shores, No. 4D13-2146, ___ So.3d ___, 2015 WL 4636887, at *2 (Fla. 4th DCA 2015); Tillery v. Fla. Dep't of Juvenile Justice, 104 So. 3d 1253, 1254 (Fla. 1st DCA 2013).   For disclosures concerning a local government entity, "the information must be disclosed to a chief executive officer as defined in [Fla. Stat. § 447.203(9)] or other appropriate local official." Fla. Stat. §112.3187(7); Rustowicz v. N. Broward Hosp. Dist., No. 4D13-2059, ___ So.3d ___, 2015 WL 3996953, at *9 (Fla. 4th DCA Jul. 1, 2015) (holding that an "appropriate local official" is the official or official entity who is affiliated with the violating governmental entity and has the authority to investigate, police, manage, or otherwise remedy the violation or act by the violating governmental entity").   Additionally, the Act protects only those employees:

> who disclose information on their own initiative in a written and signed complaint; who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity; who refuse to participate in any adverse action prohibited by this section; or who initiate a complaint through the whistle-blower's hotline or the hotline of the Medicaid Fraud Control Unit of the Department of Legal Affairs; or employees who file any written complaint to their supervisory officials or employees who submit a complaint to the Chief Inspector General in the Executive Office of the Governor, to the employee designated as agency inspector general under s. 112.3189(1), or to the Florida Commission on Human Relations.

Fla. Stat. § 112.3187(7).

Here, the record indicates that Byrd objected about the alleged retaliation verbally to the Sheriff and other lower-ranked supervisory officials, such as Sergeant Woodring, Major Hoffman, and Captain Mottola.  (See Byrd Aff. ¶¶ 3, 7, 9).  However, Byrd identifies no "written and signed complaint" under the first clause of § 112.3187(7).  Byrd does not

allege that she was requested to participate in an investigation, hearing, or other inquiry concerning governmental wrongdoing and that she made protected disclosures in connection with that inquiry. Rustowicz, 2015 WL 3996953, at *7 (holding that disclosures made during an investigation, hearing, or other inquiry concerning governmental wrongdoing need not be in writing). Byrd does not allege that she refused to participate in an adverse action prohibited by the FWA. Byrd does not allege that she initiated a complaint through a whistle-blower's hotline or the Medicaid Fraud hotline. Finally, Byrd does not allege that she submitted a complaint (verbally or in writing) "to the Chief Inspector General in the Executive Office of the Governor, to the employee designated as agency inspector general under s. 112.3189(1), or to the Florida Commission on Human Relations." Fla. Stat. § 112.3187(7); Crouch v. Pub. Serv. Comm'n, 913 So. 2d 111, 112 (Fla. 1st DCA 2005) (holding that complaints submitted to officials under the final clause do not have to be in writing).

Although the Sheriff challenged the method by which Byrd reported the retaliation for the first time in his reply brief, Byrd has not requested leave to file a sur-reply. The Sheriff's motion for summary judgment is GRANTED as to Count I.

**D.   Workers' Compensation Retaliation**

Byrd alleges a violation of Fla. Stat. § 440.205, which provides that "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law." The McDonnell Douglas burden-shifting scheme applies to Byrd's workers' compensation retaliation claim. Russell v. KSL Hotel Corp., 887 So. 2d 372, 379-80 (Fla. 3d DCA 2004). Byrd must demonstrate that: (1) she

engaged in a statutorily-protected activity; (2) an adverse employment action occurred; and (3) the adverse action was causally related to her protected activity.  Ortega v. Eng'g Sys. Tech., Inc., 30 So. 3d 525, 528 (Fla. 3d DCA 2010).  "In order to establish a claim under section 440.205, the employee's pursuit of workers' compensation need not be the only reason for a discharge."  Hornfischer v. Manatee Cnty. Sheriff's Office, 136 So. 3d 703, 706 (Fla. 2d DCA 2014).

Protected activity under the workers' compensation statute includes both filing a claim for benefits and attempting to claim benefits.  Fla. Stat. § 440.25; Posada v. James Cello, Inc., 135 F. App'x 250, 252 (11th Cir. 2005); Ortega, 30 So. 3d at 529.  Although Byrd conclusorily asserts that "all efforts to secure medical and/or indemnity benefits while a claim remains pending constitute 'protected activity,'" her response identifies no specific efforts to obtain benefits other than the filing of claims in December 2011 and December 2012.  (Dkt. 34, p. 16)

The Sheriff acknowledges that Byrd's termination constitutes an adverse action, but argues that there is insufficient evidence of a causal link, given the nine-month lapse between Byrd's second workers' compensation claim, filed on December 20, 2012, and her termination on September 18, 2013.  See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (holding that a lapse of three to four months between the protected activity and adverse action is too protracted to demonstrate causation).  In response, Byrd maintains – again, conclusorily – that "any other harassment, intimidation and coercion during the pendency of the claims" was an adverse action and that the ongoing retaliatory acts also demonstrate causation.  (Dkt. 34, pp. 16, 18)

Section 440.205 creates a cause of action for employees who suffer "intimidation or coercion" in addition to a retaliatory discharge.  Hornfischer, 136 So. 3d at 706; Chase v. Walgreen Co., 750 So. 2d 93, 99 (Fla. 5th DCA 1999).  For instance, in Andrews v. Direct Mail Express, Inc., the court determined that the employer "engaged in a series of adverse employment actions" including reprimands and overlooking the plaintiff for promotion.  1 So.3d 1192, 1194 (Fla. 5th DCA 2009).  Additionally, Florida's Second District Court of Appeal has held that a plaintiff may attempt to establish that an employer had a retaliatory motive based on actions by a third-party workers' compensation administrator.  Hornfischer, 136 So. 3d at 710.

Although Byrd's response does not identify the ongoing acts of retaliation she suffered, she does cite a paragraph from her affidavit, in which Byrd avers:

I felt harassed and retaliated against for pursuing my worker's compensation claims based upon the following:

a. Immediately following my January 2012 shoulder injury, Debbie Burns challenged me as to how the accident occurred.  Ms. Burns indicated my shoulder injury could not have possibly occurred in the MRI machine and insinuated I was lying.  I felt this was retaliatory.

b. My workers' compensation claims and my doctors were manipulated by SCSO's third-party administrator, OptaComp, prior to my termination.

c. Neither Debra Burns, the 14-year-SCSO nurse, nor Diane Sykes, the OptaComp nurse case manager, made any effort to obtain clarification as to discrepancies between my doctors in order to authorize reasonable and necessary medical care and to determine what my physical restrictions were.

d. Col. Hoffman and Capt. Marshall refused to consult with doctors or allow me to do so in order to obtain clarification as to my physical restrictions after I expressed my concerns regarding same and pointed out the discrepancies.

(Byrd Aff. ¶ 17)  In his reply, the Sheriff fails to meaningfully address whether the nature and timing of these actions suffice to demonstrate causation, or whether they constitute discrete, adverse actions.  (Dkt. 42, p. 9).  The Court declines to do so in the first instance, and, under the prevailing Florida law, leaving that matter to be addressed at trial either on a motion at the conclusion of the Plaintiff's case or by the jury.

The Sheriff's motion for summary judgment is therefore DENIED as to Count II.

## IV.  CONCLUSION

Upon consideration of the foregoing, the only issues remaining for trial are whether Byrd was retaliated against under the ADA, FRCA, and Workers' Compensation Law.  As summary judgment has been granted on the whistleblower claim, the Court finds that the facts surrounding the arrest of Bernadette Kenniff and the attempts to convince Byrd to drop the charges against Kenniff are not pertinent to the issues remaining for trial.  Therefore, the jury will be permitted to hear that Byrd was injured on her job and the nature of her injuries but otherwise will not be permitted to hear any facts regarding the Kenniff arrest. Such facts are not probative of disability and workers compensation retaliation, and any marginal relevance they might have is far outweighed by the potential prejudicial effect.

Accordingly, it is hereby **ORDERED**:

1. The Sheriff's Motion for Summary Judgment (Dkt. 22) is **GRANTED in part and DENIED in part**.

2. The matter is specially set for trial on November 16, 2015.

3. The claims remaining to be tried are retaliation claims asserted in Counts II, IV, and VI.

4.  No later than November 9, 2015 the parties shall file an Amended Joint Pretrial Statement that sets forth the factual and legal issues remaining at issue in light of this Order.

**DONE and ORDERED** in Tampa, Florida, this 28th day of October, 2015.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record